FILED

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

04 JUL 15  AM 11: 15

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| **TIMOTHY ANDERSON,** | } |
| | } |
| **Plaintiff,** | } |
| | } |
| **vs.** | } |
| | } |
| **JEFF COOPER and DR.** | } |
| **WHITEHEAD,** | } |
| | } |
| **Defendants.** | } |

**CASE NO. CV 00-B-2212-S**

**ENTERED**

JUL 15 2004

### MEMORANDUM OPINION

This case is before the court on defendants Motions for Summary Judgment. (Docs. 29,

41.) This is an action filed pursuant to 42 U.S.C. § 1983 in which the plaintiff, Timothy

Anderson, alleges that his constitutional rights were violated both during his arrest by Jefferson

County Sheriff's Deputies and while he was incarcerated in the Jefferson County Jail in

Birmingham, Alabama. Plaintiff is presently incarcerated in the Limestone Correctional Facility.

The pro se complaint was filed on August 9, 2000 and an amended complaint was filed on

December 4, 2000. (Docs. 1, 5.) The remaining defendants in this action are Jefferson County

Sheriff's Deputy Jeff Cooper and Ned Whitehead.[1] Plaintiff seeks an investigation and monetary

damages. Upon consideration of the record, the submissions of the parties, and the relevant law,

the court is of the opinion that defendant Whitehead's Motion for Summary Judgment is due to

---

[1] The court notes that in his complaint and amended complaint, plaintiff also named Robert
Cahill, Emory Anthony, Curt McKain, Jefferson County Sheriff's Department, "other officers under
the supervision of Curt McKain", "Jefferson County Employers", "Hospital Workers", and "Glock
Gun Manufacture" as defendants in this action. However, this action was dismissed against the
above named defendants on July 2, 2001. (Doc. 19.)
     The court notes further that plaintiff also named Miss Maginess as a defendant in this
action, but all claims against Miss Maginess were dismissed without prejudice on February 5, 2002,
due to plaintiff's failure to supply the court with her correct address. (Doc. 43.)

be granted, and defendant Cooper's Motion for Summary Judgment is due to be granted in part and denied in part.

## I.      Procedural History

On September 13, 2001, the court entered an Order for Special Report directing that copies of the complaint and amended complaint filed in this action be forwarded to each of the remaining defendants and requesting that they file a special report responding to the factual allegations of the complaint and amended complaint. (Doc. 23.) On November 13, 2001, defendant Jeff Cooper filed his special report attaching documents, his affidavit, and the affidavits of Jefferson County Sheriff's Deputies Curt McCune, Rod Robinson, John Verbitski, John F. Weatherly, Jr., Lieutenant Aubrey L. Finley, Sergeant Rick Sharit, and Sergeant Drummond M. Liddell. (Doc. 29.) On January 22, 2002, defendant Ned Whitehead, II, filed his special report accompanied by his affidavit. (Doc. 41.) By Order entered on September 17, 2003, the parties were notified that the special reports filed by defendants would be construed as motions for summary judgment, and the plaintiff was notified of the provisions and consequences of Rule 56 of the Federal Rules of Civil Procedure. (Doc. 57.) On November 7, 2003, plaintiff filed his opposition to defendants' motions for summary judgment. (Doc. 62.) On November 17, 2003, Cooper filed his first amendment and supplementation of initial disclosures and special report. (Doc. 63.) On January 8, 2004, plaintiff filed the affidavit of his mother, Jannette Anderson, in support of his opposition to defendants' motions for summary judgment. (Doc. 66.) Plaintiff also filed an opposition to Cooper's supplement on January 14, 2004. (Doc. 67.)

2

## II.    Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e) requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).   A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the judge's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *See id.* at 255.  Nevertheless, the nonmovant need not be given the benefit of every inference but only of every *reasonable* inference. *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## III.    Facts

Applying these standards to the evidence before the court, the following facts appear to be undisputed or, if disputed, have been taken in a light most favorable to the plaintiff. After leaving work on January 31, 2000, plaintiff stopped to order food at the Hong Kong Restaurant.

3

(Doc. 1 at 12; Doc. 5 at 3.) On January 31, 2000, defendant Cooper was working with the Vice and Narcotics Unit with several other deputies on a case involving plaintiff. (Doc. 29, Ex. 1 ¶ 3.) Deputy Curt McCune, the case agent on the investigation, received information from a confidential and reliable informant, who previously gave information leading to arrests and seizures of controlled substances, that plaintiff would be at a particular location at a particular time in possession of cocaine. (*Id.*) Cooper participated in surveillance of that location along with Deputies McCune, Robinson, Verbitski, Weatherly, and Liddell, as well as Sergeants Finley and Sharit. (*Id.*)

When plaintiff arrived, Cooper received a radio command to move into the restaurant parking lot where plaintiff was located. (Doc. 29, Ex. 1 ¶ 4.) Cooper was in an unmarked Chevrolet Z71 pickup truck along with Deputy John Weatherly. (*Id.*) Plaintiff placed his food order. (Doc. 1 at 12; Doc. 5 at 3; Doc. 29, Ex. 1 ¶ 5.) When plaintiff pulled to the "drive-thru" window to pay for his order, Cooper and other deputies moved their vehicles in order to block plaintiff's vehicle. (Doc. 29, Ex. 1 ¶ 5.) According to plaintiff, Cooper pulled in and blocked plaintiff while Deputy John Weatherly[2] blocked plaintiff from behind. (Doc. 1 at 12.) Cooper states that Deputies Liddell and Verbitski pulled up behind plaintiff's vehicle to block his escape from the rear while he and defendant Weatherly pulled around in front of plaintiff's vehicle to block his escape from the front. (Doc. 29, Ex. 1 ¶ 5; Ex. 5, ex. 1; Ex. 8, ex. 1; Doc. 35, Ex. 1.) In either event, it is undisputed that the deputies blocked plaintiff's vehicle in order to prevent him from leaving the area. (*Id.*)

---

[2] It is noted that plaintiff misspelled defendant Weatherly's last name in his complaint as "Weatherbee".

4

Cooper exited his vehicle wearing a black jacket with gold letters on it identifying him as a deputy sheriff and announced in a loud voice several times, "Sheriff's Department. Turn the vehicle off." (Doc. 29, Ex. 1 ¶ 5; Ex. 5, ex. 1; *see also* Ex. 8, ex. 1; Doc. 35, Ex. 1.)  What happened next is disputed.  In his complaint, plaintiff alleges Cooper "pull in and blocked me in with John Weatherbee behind me; got out of a unmarked truck and shot me in the face.  No warning shot or shot fired into tire, not even trucks touching in the accident claim that cause the shooting." (Doc. 1 at 12.)  In the affidavit attached to his opposition brief, plaintiff states:

> [s]uddenly a man jumped out of the truck yelling.  As I moved to put the Expedition in park I saw him close one eye and extend his arms toward me.  I ducked, and that is the last thing I can recall until I woke up in the hospital.  I remember nothing else about what happened after I was shot.

> One thing that I will swear is that I never put the vehicle I was driving into reverse, squealed tires, or hit anybody else's vehicle.  I never drove forward towards Officer Cooper and in fact, never made any move that could be considered threatening.  Jeff Cooper meant to kill me in cold blood on January 31, 2000.

(Doc. 62, Pl.'s Aff. at 2.)  Plaintiff believes his "vehicle rolled into [Cooper's] pick-up truck after [plaintiff] was shot in the face.  (Doc. 62, Pl.'s Aff. at 2.)  Plaintiff submitted a second affidavit with his additional opposition brief, where plaintiff states he believes the pictures of the scene (doc. 63, ex. G):

> show just as I have said all along that officer Cooper shot me from well to my right and I was not going toward him when he shot me.  I again swear that I never made any threatening gesture warranting Cooper shooting me in the head to kill me.  It just does not make sense to say I was spinning tires backwards and forwards when the damage is not consistent with that having occurred.

(Doc. 67, Ex. 1 at 2.)

.

Cooper and the other officers who were at the "drive-thru" tell a different story. After Cooper exited the car and yelled for plaintiff to turn off the car, Cooper stated plaintiff immediately "put his vehicle in reverse spinning the tires which caused his vehicle to run into Deputy Liddell's vehicle behind him. Then [plaintiff] quickly put his vehicle in drive and spun the wheels which caused the vehicle to move rapidly forward directly at me." (Doc. 29, Ex. 1 ¶ 6.) Cooper further states:

> [i]n the span of a very short period of time, I fired one shot at [plaintiff] left handed as I jumped to my right out of the way of the vehicle [plaintiff] was driving just as it impacted my vehicle. At the time I fired, I believed that my life was in danger because [plaintiff] was coming right at me. Had I not jumped to avoid being hit, I would have been severely injured or killed as a result of being crushed between [plaintiff's] vehicle and my vehicle.

(Doc. 29, Ex. 1 ¶ 7.) The reports filed by the other officers at the "drive-thru" corroborate Cooper's story, as does Lieutenant Finley's memorandum for commendation of Cooper for his actions during the incident in question. (Doc. 29, Ex. 5, ex.1; Ex. 6, ex. 2; Ex. 8, ex. 1; Doc. 35, Ex. 1.)

While there is a dispute as to what transpired between the time Cooper exited his vehicle and the time that plaintiff was shot, it is undisputed that Cooper shot plaintiff in the face. (Doc. 1 at 12; Doc. 5 at 5.) The bullet struck the base of plaintiff's head and is lodged in the back of his neck. (Doc. 5 at 5.) No warning shot was fired and no shot was fired into the tire. (Doc. 1 at 12.) Plaintiff was taken to Cooper Green Hospital, transferred to UAB Hospital, and then taken to the Jefferson County Jail. (Doc. 1 at 12.) Cocaine, United States currency, and a pistol were found in plaintiff's vehicle. (Doc. 29, Ex. 1 ¶ 8.) Plaintiff was later convicted of reckless endangerment and possession of cocaine while in possession of a firearm. (*Id.*) Plaintiff is

6

presently serving a twenty-five year sentence in the custody of the Alabama Department of Corrections. (*Id.*)

When plaintiff arrived at the jail, he was taken to the medical floor of the jail. (Doc. 62, Pl.'s Aff. at 3.) Plaintiff "sometimes . . . had no idea" what medication he was receiving, but it was not helping. (*Id.*) He does know that the medication he received later was not as effective as the medication ordered by the hospital. (*Id.*) Plaintiff "had many appointments made which were never carried out." (*Id.*) His medication was ineffective for the severity of his pain or was not what was prescribed. (*Id.*) Plaintiff had "periods of severe pain, headaches, blackouts, abnormal weight loss, back pain, and other pains." (Doc. 5 at 5.) When plaintiff explained the severity of his pain to the doctors and nurses and informed them that he wanted to consult a specialist, the doctors and nurses informed him that it would cost too much. (Doc. 62, Pl.'s Aff. at 3-4.) Plaintiff completed sick call slips, had family members call the jail, and filed grievance forms, in an effort to receive proper medical attention. (Doc. 1 at 8.) Plaintiff was prescribed the following medications: a muscle relaxer, pain pills, Alaville (sic), and Vistarell (a sleeping pill). (Doc. 5 at 5.) Plaintiff asked to see a doctor time and again, but only saw a nurse or no one at all. (Doc. 62, Pl.'s Aff. at 4.)

Plaintiff's mother visited him almost every week while he was incarcerated in the Jefferson County Jail. (Doc. 66 at 2.) Ms. Anderson repeatedly telephoned officials of the jail in an effort to obtain proper medical care for plaintiff. (*Id.*) Ms. Anderson even talked with Sheriff Jim Woodward who told her that he would do something to help the plaintiff. (*Id.*) Ms. Anderson talked with medical personnel on one occasion about plaintiff's care, but was told there were no requests on file for medical care. (*Id.*)

7

Defendant Whitehead is employed at the Jefferson County Jail as an administrative analyst. (Doc. 41, Ex. 1 at 1.) Whitehead has held this position since May 2001. (*Id.*) At the time of the incidents about which plaintiff complains, Whitehead was employed by Jefferson County, Alabama, doing business as Cooper Green Hospital, who contracted to provide medical services to inmates at the Jefferson County Jail. (*Id.*) Whitehead "provided administrative services to Jefferson County Jail personnel at that time." (*Id.*) Contrary to plaintiff's allegations, defendant Whitehead is not a physician. (*Id.*) Whitehead had no responsibility for and did not provide medical services to plaintiff or to the other inmates housed at the Jefferson County Jail during the times plaintiff alleges. (Doc. 41, Ex. 1 at 1-2.)

## IV.    Discussion

As relief for the alleged constitutional violations, plaintiff seeks monetary damages and an investigation. This court does not engage in monitoring or investigations and is without authority to order any other entity to undertake such action. Therefore, the court will only address plaintiff's request for monetary damages.

### A.    Official Capacities

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI. This Amendment bars suits

8

in federal court against the State brought by its own citizen as well suits brought by the citizen of another State. *See Edelman v. Jordan*, 415 U.S. 651, 663 (1974).

"A state official may not be sued in his official capacity unless . . . Congress has abrogated the state's immunity." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997). "Congress has not abrogated Eleventh Amendment immunity in section 1983 cases." *Cross v. Alabama*, 49 F.3d 1490, 1502 (11th Cir. 1995)(quoting *Carr v. City of Florence,* 916 F.2d 1521, 1525 (11th Cir.1990)); *see also Lancaster* 116 F.3d at 1429.

Plaintiff sued the defendants in their official capacities; however, as a county sheriff's deputy and an administrative employee of Jefferson County, the defendants cannot be held liable in damages, in their official capacities, for their own acts or those of their employees because they enjoy Eleventh Amendment immunity. The state is effectively the real party in interest when damage awards would be paid by the state. *Carr v. City of Florence, Ala.*, 916 F.2d 1521, 1524 (11th Cir. 1990) (citing *Edelman v. Jordan*, 415 U.S. 651, 663 (1974)). A county is not responsible for the alleged tort of deliberate indifference to a detainee's medical needs. *Marsh v. Butler County, Ala.*, 268 F.3d 1014, 1026-27, n.6 (11th Cir. 2001). County officers are entitled to dismissal of any claims for damages brought against them in their official capacities as state officials. In *Parker v. Williams*, 862 F.2d 1471, 1475-76 (11th Cir. 1989), it was held that the Eleventh Amendment bars § 1983 lawsuits against county sheriffs, sued in their official capacities. It was subsequently held that the sheriff's Eleventh Amendment immunity "extends to deputy sheriffs because of their traditional function under Alabama law as the sheriff's alter ego." *Carr*, 916 F.2d at 1527. To the extent defendants Whitehead and Cooper are sued in their official capacities, they are immune from damages liability.

9

**B.      Individual Capacities**

The court notes only two claims for relief remain: 1) plaintiff's claim that Cooper used excessive force upon him by shooting him during his arrest on January 31, 2000, and 2) that while incarcerated at the Jefferson County Jail, suffering from injuries sustained when he was shot by Cooper during his arrest, Whitehead denied plaintiff adequate medical care.  Although plaintiff named other defendants and raised other claims in his complaint and amended complaint, the other defendants and all of plaintiff's other claims were dismissed by this court on July 2, 2001.  (*See* Doc. 19.)

**1.      Inadequate Medical Care**

Plaintiff was both a pretrial detainee and a convicted prisoner during his incarceration in the Jefferson County Jail. When plaintiff was initially incarcerated in the Jefferson County Jail, he was a pretrial detainee. He was subsequently convicted and remained incarcerated at the jail until he was transferred to the custody of the Alabama Department of Corrections. The Due Process Clause of the Fourteenth Amendment requires a state to provide a pretrial detainee "with some minimal level" of "such basic necessities as food, living space, and medical care." *Hamm v. DeKalb County*, 774 F.2d 1567, 1573-74 (11th Cir. 1985), *cert. denied*, 475 U.S. 1096 (1986). The Due Process clause requires governmental agencies to "provide medical care to persons . . . who have been injured while being apprehended by the police. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  "[T]he minimum standard allowed by the due process clause is the same as that allowed by the eighth amendment for convicted persons." *Hamm*, 774 F.2d at 1574.  Further, the due process rights of a pretrial detainee "are at least as great as the Eighth

10

Amendment protections available to a convicted prisoner." *City of Revere*, 463 U.S. at 244.

Since the due process rights of pretrial detainees are as great as those for convicted prisoners, it is

not necessary to distinguish when plaintiff was a detainee and when he was a convicted prisoner.

*See Hill v. Dekalb Regional Youth Detention Center*, 40 F.3d 1176, 1186 n.19 (11th Cir. 1994).

The Supreme Court, in *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976), "held that

deliberate indifference to [a convicted prisoner's] serious medical needs is proscribed by the

Eighth Amendment's prohibition against cruel and unusual punishment." *Harris v. Coweta*

*County*, 21 F.3d 388, 393 (11th Cir. 1994).  Plaintiff cites *Ancata v. Prison Health Services, Inc.*,

769 F.2d 700, 703-04 (11th Cir. 1985), where the Eleventh Circuit held the complaint

sufficiently alleged a claim of deliberate indifference to serious medical needs after the medical

personnel caring for the prisoner "failed to provide even that level of diagnostic care that they

themselves believed necessary."  However, "[n]either inadvertent failure to provide adequate

medical care nor a physician's negligence in diagnosing or treating a medical condition states a

valid claim of medical mistreatment under the Eighth Amendment." *Hill v. Dekalb Regional*

*Youth Detention Center*, 40 F.3d 1176, 1186 (11th Cir. 1994)(citations omitted).

A two-part analysis is employed in determining whether an Eighth Amendment violation

has occurred.  "First, we must evaluate whether there was evidence of a serious medical need; if

so, we must then consider whether [the defendant's] response to that need amounted to deliberate

indifference." *Mandel v. Doe*, 888 F.2d 783, 788 (11th Cir. 1989).  The first inquiry is objective;

the second inquiry is subjective. *See Hill*, 40 F.3d at 1186.

"'[A] "serious" medical need is one that has been diagnosed by a physician as mandating

treatment or one that is so obvious that even a lay person would easily recognize the necessity for

a doctor's attention.'" *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1187 (quoting

*Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)); *Farrow v. West*, 320 F.3d 1235,

1243 (11th Cir. 2003). "[T]he medical need of the prisoner need not be life threatening" to be

considered serious. *Washington v. Dugger*, 860 F.2d 1018, 1021 (11th Cir. 1988).

The second part of the inquiry -- whether the response of the defendant amounted to

deliberate indifference -- is itself a two-part determination.  A defendant may be held liable for

an Eighth Amendment violation only if he had "knowledge of the [plaintiff's] particular medical

condition," *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d at 1191 (emphasis

omitted), and he acted intentionally or recklessly to deny or to delay access to medical care or to

interfere "with the treatment once prescribed," *Estelle v. Gamble*, 429 U.S. at 104-05. *See also*

*Mandel v. Doe*, 888 F.2d at 788. *See generally Farmer v. Brennan*, 511 U.S. 825, 833-842

(1994).

"It is obduracy and wantonness, not inadvertence or error in good faith, that characterize

the conduct prohibited by the Cruel and Unusual Punishments Clause . . . ." *Whitley v. Albers*,

475 U.S. 312, 319 (1986). "Mere negligence or medical malpractice" on the part of the

defendant is not sufficient to support an Eighth Amendment claim. *Mandel v. Doe*, 888 F.2d at

787-88. Therefore, an accidental or inadvertent failure to provide medical care or negligent

diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth

Amendment. *Estelle*, 429 U.S. at 106. "Nor does a simple difference in medical opinion

between the prison's medical staff and the inmate as to the latter's diagnosis or course of

treatment support a claim of cruel and unusual punishment." *Harris v. Thigpen*, 941 F.2d 1495,

1505 (11th Cir. 1991)(citations omitted). "Medical treatment violates the eighth amendment

only when it is 'so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Id*; (citation omitted).

In determining what facts are undisputed, the court must begin with those specifically and expressly stated by the plaintiff. The court must also take into account those facts stated by Whitehead which are not disputed by plaintiff. Facts submitted by Whitehead and not expressly disputed by plaintiff cannot be ignored in the summary judgment calculus because they too exist as "undisputed" facts. As the Supreme Court explained in *Celotex, supra,* the ultimate burden is on plaintiff to come forward with evidence supporting each element of his claim. Because the burden of proof in the lawsuit is on plaintiff, he may not merely rest upon conclusory or vague pleadings, but must affirmatively rebut evidentiary matters offered by Whitehead which, if left undisputed, show that plaintiff is not entitled to recover in the action.

In his sworn affidavit, Whitehead states that at the times pertinent to the allegations in plaintiff's complaint, he was employed by Jefferson County, Alabama, doing business as Cooper Green Hospital, and that he provided administrative services to Jefferson County Jail personnel at that time. Also, Whitehead stresses that he is not a physician as alleged in the complaint. He states that he did not provide medical services to plaintiff or to the other inmates housed at the Jefferson County Jail at the times pertinent to the complaint and that he was not responsible for providing those medical services at all times pertinent to the complaint. Although plaintiff filed an opposition to the defendants' motions for summary judgment (doc. 62), and a second opposition to the defendants' motions for summary judgment (doc. 67), plaintiff failed to dispute the sworn statements made by Whitehead. Other than referring to Whitehead as "Dr. Whitehead" in his affidavit supporting his first opposition brief (doc. 62, pl.'s aff.), plaintiff fails to rebut, or

13

even dispute, Whitehead's sworn statements that he is not a physician, he did not provide medical services, and he was not responsible for providing medical services to plaintiff or other inmates housed at the Jefferson County Jail at the time pertinent to the complaint. Because Whitehead is not a physician, he is not authorized to prescribe medication.

Following the analysis set out in *Mandel*, 888 F.2d at 788, *Hill*, 40 F.3d at 1191, and *Estelle*, 429 U.S. at 104-05, this court must first determine whether plaintiff had a serious medical need. Plaintiff was shot in the face and the bullet was lodged in his neck at all times relevant to this case. Prior to his arrival at the Jefferson County Jail, plaintiff had been hospitalized due to his gunshot wound. Since plaintiff arrived on the medical floor at the jail, the jail staff knew plaintiff needed additional treatment, and therefore had a serious medical need.

The question then turns to whether plaintiff was treated with deliberate indifference. For plaintiff to establish this prong, he must present evidence on which a reasonable jury could find that Whitehead knew of plaintiff's serious medical condition, and intentionally delayed or denied his access to care, or interfered with plaintiff's treatment after it was prescribed.

Plaintiff does not contend he was denied medical attention. Rather, plaintiff claims that his "medical condition has intentionally been limited and negligently administered." (Doc. 5 at 5.) Plaintiff claims that he was "in need of a private medical treatment the type and kind the Jefferson County Jail can not adequately provide." (Doc. 5 at 5.) Plaintiff admits that he received medication in the form of muscle relaxers, pain pills, "Alaville," and "Vistarell," a sleeping pill. (Doc. 5 at 5.) Plaintiff complains, however, that the medication was either not what had been prescribed or was ineffective for the severity of his pain. However, there is not sufficient evidence on which a reasonable jury could find that the medication plaintiff received

14

was not what had been prescribed. Plaintiff also admits that upon his arrival at the jail from the hospital, he was taken to the medical floor. (Doc. 62, Pl.'s Aff. at 3.) Further, the medical records show that during plaintiff's incarceration at the Jefferson County Jail following the shooting, he was dispensed several different types of medications on a regular basis. (Doc. 29, Ex. 9.) The medications include Naproxyn, Elavil, Keflex, Tylenol, Salsalate, Amitriptyline, Propranolol, Corgord, Gauifenesin, Percogesic, and Antifungal Cream. (Doc. 29, Ex. 9.) The medical records also reveal that plaintiff filed numerous requests for medical treatment and that he was seen on numerous occasions by medical personnel while incarcerated in the Jefferson County Jail. (Doc. 29, Ex. 9.)

Plaintiff fails to show any instances where Whitehead actually treated or attempted to treat plaintiff for his medical problems. Plaintiff does not cite or refer to any of the signatures in the medical evidence as being the signature of Whitehead, and the court's review of the medical evidence, although sometimes illegible, failed to discover Whitehead's signature. Accordingly, this court finds that Whitehead did not provide plaintiff with inadequate medical care as plaintiff alleges, because Whitehead never provided plaintiff with any medical care while plaintiff was incarcerated in the Jefferson County Jail. It appears plaintiff failed to properly name the medical personnel who were actually caring for him during his incarceration in the Jefferson County Jail. Therefore, his claims against Ned Whitehead are due to be dismissed.

It is also clear that the medical personnel's response to plaintiff's medical needs did not amount to deliberate indifference. The medical personnel, as evidenced by plaintiff's numerous medications, attempted to treat plaintiff's medical conditions. Plaintiff disagrees with the treatment provided by the medical staff at the jail and would have preferred to have been treated

by other medical personnel.  However, as previously noted, "a simple difference in medical

opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of

treatment" will not support a claim of cruel and unusual punishment. *Harris v. Thigpen*, 941

F.2d 1495, 1505 (11th Cir. 1991).  Assuming plaintiff brought his claim for inadequate medical

treatment against the medical personnel who actually treated him while he was in the Jefferson

County Jail, such claim would fail because there is insufficient evidence to show the personnel at

the jail acted with deliberate indifference to plaintiff's serious medical condition.

### 2.    Excessive Force

In determining whether excessive force was used by an arresting officer, a court must

apply a Fourth Amendment analysis, concentrating on whether the challenged use of force was

reasonable under the circumstances. *Graham v. Connor*, 490 U.S. 386, 395 (1989).  "The

'reasonableness' of a particular use of force must be judged from the perspective of a reasonable

officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.  The standard

requires a court to determine "whether the officers' actions are 'objectively reasonable' in light

of the facts and circumstances confronting them, without regard to their underlying intent or

motivation." *Id.* at 397.  This objective test "requires careful attention to the facts and

circumstances of each particular case, including the severity of the crime at issue, whether the

suspect poses an immediate threat to the safety of the officers or others, and whether he is

actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396.  When determining an

officer's reasonableness, courts must account "for the fact that police officers are often forced to

make split-second judgments–in circumstances that are tense, uncertain, and rapidly

evolving–about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

The United States Supreme Court has also stated:

> [w]here [an] officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985); *Pruitt v. City of Montgomery*, 771 F.2d 1475, 1478-79 (11th Cir. 1985); *see also Vaughan v. Cox*, 343 F.3d 1323 (11th Cir. 2003). But, when a fleeing felon poses no threat to the officer or others, the use of deadly force to seize the suspect or prevent him from escaping is unreasonable. *See Tennessee v. Garner,* 471 U.S. at 11. A review of the differing descriptions given by the parties to the incident makes clear that there are genuine issues of material fact which preclude summary judgment on the excessive force claim against defendant Cooper.

The issue involving plaintiff's claim against Cooper for use of excessive force is whether Cooper had reason to properly believe that plaintiff posed a threat of serious physical harm such that Cooper was justified in using deadly force by firing his weapon at plaintiff. When deciding this issue, courts use an objective test of reasonableness, given the particular circumstances. One factor that may be considered by courts is whether the suspect is actively resisting arrest or attempting to evade arrest by flight.

In this case, the officers on the scene all stated that plaintiff was attempting to leave the scene by reversing his truck and spinning his tires, and then spinning his tires in the forward direction, causing Cooper to fear for his life and fire his weapon at plaintiff's vehicle, striking

17

plaintiff in the neck.  Cooper alleges that plaintiff's actions happened in a very quick time frame and only allowed Cooper an instant to react.  When officers are threatened by a suspect's weapon, in this case plaintiff's vehicle, they have a duty to give some warning prior to using deadly force, only where it is feasible.  It is undisputed that Cooper warned plaintiff.  Exactly what happened next is unclear.  Cooper testified he announced to plaintiff, "Sheriff's Department.  Turn the vehicle off."  Cooper alleges that plaintiff attempted to leave the scene by reversing his vehicle, spinning its wheels, and then rapidly driving it forward in Cooper's direction.  (Doc. 29, Ex. 1 ¶ 6.)  "In the span of a very short period of time, [Cooper] fired one shot at [plaintiff] left handed as [he] jumped to [his] right out of the way of [plaintiff's vehicle] just as it impacted [Cooper's] vehicle."  (Doc. 29, Ex. 1 ¶ 7.)  At the time he fired, Cooper says he believed his life was in danger because plaintiff's vehicle was coming toward him.  (*Id.*)  Cooper contends that had he not jumped to avoid being hit, he would have been severely injured or killed as a result of being crushed between plaintiff's vehicle and his own vehicle.  (*Id.*)  Assuming Cooper's version of events is true, plaintiff's actions would have created a scenario where it would not have been feasible for Cooper to give plaintiff any further warning.

On the other hand, in his affidavit, plaintiff claims he did not attempt to elude the police by reversing and then driving his vehicle forward.  Plaintiff claims he did nothing to provoke Cooper and Cooper shot him trying to kill him.  In his affidavit, plaintiff states:

> [s]uddenly a man jumped out of the truck yelling.  As I moved to put the Expedition in park I saw him close one eye and extend his arms toward me.  I ducked, and that is the last thing I can recall until I woke up in the hospital.  I remember nothing else about what happened after I was shot.
>
> One thing that I will swear is that I never put the vehicle I was driving into reverse, squealed tires, or hit anybody else's vehicle.  I never drove forward

18

towards Officer Cooper and in fact, never made any move that could be considered threatening.  Jeff Cooper meant to kill me in cold blood on January 31, 2000.

(Doc. 62, Pl.'s Aff. at 2.)  This affidavit testimony by the plaintiff is sufficient to create a genuine

issue of material fact as to what provocation defendant Cooper had prior to discharging his

firearm.  Therefore, the court finds Cooper's Motion for Summary Judgment on plaintiff's claim

for excessive force against Cooper in his individual capacity is due to be denied.

Although this court finds there is a question of fact, the court notes that it believes the

photographic evidence strongly suggests Cooper's version of events is the true and correct

version.  Other than his affidavit testimony, plaintiff has not presented any evidence to support

his claim.  Every officer who witnessed the actions immediately prior to Cooper discharging his

firearm corroborated Cooper's story.  In addition, Cooper presented approximately 70 photos of

the scene and related evidence.  (Doc. 63, Ex. G at 1-27.)  Several of these photos show

plaintiff's vehicle pointed in such a direction that the only reasonable inference to be made is that

plaintiff was attempting to leave the "drive-thru" lane.  (Doc. 63, Ex. G at 21-23, 25-26.)

Specifically, the middle photo on page twenty-one shows plaintiff's vehicle is clearly angled

several feet away from the "drive-thru" window, a distance in which no person would be able to

make physical contact with the "drive-thru" attendant.  (Doc. 63, Ex. G at 21.)  Several photos

also show that the tires on plaintiff's vehicle are turned away from the "drive-thru" window,

indicating that plaintiff's vehicle was attempting to avoid Cooper's vehicle, escape from the

scene, and avoid arrest.

Plaintiff addresses these photos in his affidavit, but he fails to explain the inconsistencies they create with his testimony regarding the events immediately prior to his being shot by Cooper. (Doc. 67, Ex. 1 at 2.)  Regarding the photos of the scene, plaintiff states he believes the

> pictures show clearly I did not attempt to run over officer Cooper.  In fact, I will state from my view of these pictures they prove that the officers' statements and affidavits were absolutely false as to how the incident happened.  Also the pictures show just as I have said all along that officer Cooper shot me from well to my right and I was not going toward him when he shot me.

(Doc. 67, Ex. 1 at 2.)  These statements by plaintiff do not explain the inconsistencies created by the photos, and do not address why his vehicle is angled and so far away from the restaurant's "drive-thru" window.  Nevertheless, because the court is not the fact-finder, and is not permitted to weigh the evidence, the credibility of Officer Cooper, the plaintiff and other witnesses to the event must be resolved by a jury.


## V.    Conclusion

For the reasons stated herein, the court finds that the defendants' Motions for Summary Judgment will be granted in part and denied in part.  Plaintiff's claims against Whitehead and Cooper in their official capacity will be dismissed and plaintiff's claim against Whitehead for inadequate medical care in his individual capacity will be dismissed.  Plaintiff's claim against Cooper for excessive use of force in his individual capacity will be denied because there are genuine issues of material fact which preclude summary judgment.  This case will be referred to a magistrate judge for a pretrial conference.

**DONE** this the _14th_ day of July, 2004.

SHARON LOVELACE BLACKBURN
United States District Judge